# UNITED STATES DISTRICT COURT
# FOR THE
# DISTRICT OF VERMONT

-----------------------------------------

Bruce Marshall & Jeanine Weir
 (Plaintiffs)

V.                                                    Case No. 5:19-cv-246

National Bank of Middlebury
(Defendants)

-----------------------------------------



## AMENDED COMPLAINT

1) Now comes Bruce Marshall and Jeanine Weir, proceeding in Proper Personae, in filing this complaint which first seeks discovery as regards the performance of duties under Federal Statute, law & with ethical responsibility, of the National Bank of Middlebury concerning its clients Larry and Karen Bassett, whom utilized their account with National Bank of Middlebury in defrauding Plaintiffs, and whom forwarded and furthered their ponzi scheme through home refinancing's obtained likewise from the bank. We do seek & insist upon a jury trial for this case.

## JURISDICTION

2) Plaintiffs reside in the State of Vermont and Mr. Marshall has an account with National Bank of Middlebury.

3) National Bank of Middlebury is a Federally chartered Banking Institution located in Vermont.

4) Sum of money defrauded us (which is the amount still owed us after the May 2017 $27,000 paid from the Bassett's Cornwall, Vermont house sale proceeds) being $211,198 qualifies for consideration of this case in Federal Court.

5) Mr. Bassett's transactions with Mr. Marshall were through National Bank of Middlebury.

## GENERAL ALLEGATIONS

6) Plaintiff restates and incorporates the statements of fact & allegations set forth above as if fully incorporated herein.

7) At a time of serious illness for Mr. Marshall's wife Jeanine, we were introduced to Mr. Bassett, a former employee of Middlebury College and a CPA licensed by the State of Vermont, by a friend, Sallie Mack, who stated that she had been invested with Mr. Bassett, a 'day trader' in tech stocks for over 13 years, with good returns on investment, for a small pool of friends and family. She told us she received monthly earning reports & IRS 1099 INT forms from Larry.

8) Mr. Bassett confirmed as such and stated that he was earning between 13-15%, that he did not take a commission but that a larger pool benefitted his earnings as a whole, and that because his family's money was invested that he "would not risk it", & that he was very conservative with his approach, utilizing stop loss orders and dipping in and out of the market with only part of the pool of money each time.

9) Mr. Bassett affirmed that should Mr. Marshall want to try things out, that he would provide monthly earnings reports, IRS 1099 INT's and that money provided to Mr. Bassett would be under contract where money would be returned, (with earnings) on request within ten business days.

10) Mr. Marshall began his investment relationship with Mr. Bassett in Sept 2014 with $10k and proceeded upon positive IRS 1099 INT reports for 2014 & 2015 and positive monthly earning reports (written and also many verbal), to invest a total sum of $197,000 (this was our full original principle invested.)

11) In early February 2017 Mr. Bassett informed Plaintiffs that he had lost all of the investors money, to which he said the total he had lost was over $1.2 million, and told us he had been giving false monthly earning reports & false IRS 1099 INT forms, that he had been reporting earnings to investors while he had in fact been losing in trading. He said that he had kept throwing funds in the market to try to regain from his losses until all the money was gone, without the knowledge or permission of investors to use their funds as such. He knew this was wrong & acted very apologetic and remorseful, said he wanted to be given a chance & that he was committed to working hard to paying back all the funds to investors. Larry & his wife Karen both committed to hard work to repay us and all the investors, said they were destitute with no assets to repay people except for the proceeds which would come from the sale of their house in Cornwall, Vermont. They said they were moving to Texas to live with family (who would "take them in"), that Larry was seeking a full time CPA job in Texas and they would work businesses together as well, for our and all the investors repayment. Together they put forth a strong front of grief over Larry's dishonesty & commitment to hard work for everyone's repayment. We tried to be merciful and give them the chance they asked for.

**12)** In March 2017 Mr. Bassett emailed and then postal mailed a signed promissory note for Mr. Marshall for $238,198 .

**13)** In May 2017 after it was revealed to present plaintiffs that Mr. Bassett had lied and deceived us as concerns the equity he had in his house & with other things imbalanced, with overall lack of trustworthiness displayed, Mr. Marshall placed the contracts he had with Mr. Bassett, of the $197,000 in original principle invested, as liens against the property with the Cornwall, Vermont Town Clerk.

**14)** The Bassett's did not contest our liens, knowing full well what we are owed, and on May 15, 2017 a Notarized contract, the May 15th contractual Agreement, was signed between Larry and Karen Bassett and Bruce Marshall and Jeanine Weir, the Bassett's both agreeing to repay all owed Marshall & for the Bassett's to give us full financial disclosure & to utilize an escrow for the house sale & all future payments to investors (for the sake of oversight.) Mr. Marshall recovered $27,000 from the Bassett's through a check from the Mortgage Company involved with the sale of the Bassett's home.

**15)** The May 15th Agreement stipulated that the Bassett's provide amongst other concerns, full financial disclosure, to which the Bassett's would later in 2017 provide bank statements from their joint checking account with the National Bank of Middlebury. We regretted that we postponed fully looking at these bank records until months after we received them, (due to the trauma and overwhelming nature of the situation and having so much else to attend to in our lives and with the case) as the overall contents of these records is indeed shocking, in the full context of the situation. From these records alone we saw that the Bassett's had not been destitute as claimed, and we saw very much else.

**16)** In spring 2018 Marshall and Weir initiated a complaint with the Vermont Securities Division regarding the actions of Mr. Bassett. They have an ongoing investigation into Mr. Bassett's case.

**17)** In November 2018 Marshall and Weir filed suit in Federal District Court for the District of Vermont against the Bassett's, 5:18-cv-196 (Marshall at al v Bassett et al.)

**18)** On February 12, 2018, the Bassett's filed for Bankruptcy in The EASTERN DISTRICT OF TEXAS 19-20023

**19)** In Bankruptcy Court at the Meeting of Creditors it was admitted under oath by Mr. Bassett that he had had been falsifying IRS 1099 INT's and monthly written (as well as verbal) earnings reports given investors (for a long time) and Larry (and Karen) said that they had refinanced their home in Cornwall, Vermont in order for Larry to "repay investors" and for Larry to keep throwing money in

the market to try to regain from his losses, and they said Larry had likewise used inheritance money for these same purposes. Serious felonies were admitted to by Mr. and Mrs. Bassett under oath.

In our last Court complaint draft we wrote "See Exhibit A, transcript excerpts of some things admitted by Larry and Karen Bassett at the two Creditor's meetings, which totaled together three hours in length.) { Note: Due to being told the Court will be closing early today due to snow & our need to file today, & due to the past weeks of being consumed with various other pressing matters such as dealing with Lyme disease, we will need to amend our Complaint later to add all Exhibits, legal citations, causes of action, etc, for the Complaint's completion.}" & due to continued very serious chronic illness and other unavoidable factors we have not had time to fully amend this Complaint with all Exhibits we wanted to include, etc, so again are asking to be able to amend this again later, as have need have this filed today as is.

**20)** Although during a past trip to the Cornwall Town records we had noticed one or two such home refinancing loans & had not had time to look further into this, yet after Larry (and Karen) admitted this under oath, we went back again to the Town Hall & discovered that the Bassett's had refinanced their home a total of 8 times between 2001-2009, demonstrating that that they had been losing money well before Mr. Marshall began investing with Mr. Bassett.

**21)** Those home refinancing's (totaling over $1 million dollars) were paid off in very short order by the Bassett's, sometimes in less than a year. Not all of these refinancing's were with the National Bank of Middlebury, yet numerous were.***

**22)** Presently the U.S. Trustee, William T. Neary, has opened up a complaint (objection to discharge) against the Bassett's discharging of their debts through Bankruptcy (19-02002, United States Trustee et al v. Bassett et al), after Marshall and Weir had made explicit complaint to the Department of Justice and the United States Trustee's Office that "Bankruptcy Court must not be used as a getaway car for fraud" & supplied much information. Other investors also did voice dismay and questioned Mr. Bassett at the Creditors Meetings.

**23)** The Trustee handling the Bassett estate, Mr. Michael J. McNally, has also opened up a Complaint against Mark (son of Larry and Karen) and Charity Bassett and Mr. Bassett's brother (19-02003, Trustee et al v. Bassett et al), for fraudulent transfer of asset's of Larry Bassett, to Larry & Karen's children and brother (right before and after Larry and Karen told us they were destitute with no asset's for anyone's repayment except for their Cornwall home.)

**24)** Marshall and Weir have also made contact with the FBI, IRS, and Vermont Board of Professional Regulation, etc & so forth, in our quest for justice and

recovery of funds which are critical to our long term survival. We have been forced to work very hard in seeking for help in this situation, which has included contacting many agencies and officials of various capacities. We have had to spend the past 2 and ½ to 3 years studying the law, writing documents, talking to private investigators, forensic accountants, certified fraud examiners and both highly experienced fraud lawyers & many other lawyers, in what overall has been a very exhausting time.

25) In light of the foregoing, it is by our examination of the Bassett's banking records with the National Bank of Middlebury that it looks to us that Mr. Bassett was using that account to launder funds & it was certainly being used to commit felonies (a ponzi scheme), with many transactions happening regularly for years that were clear red flags & should have been reported to proper authorities, as per the Bank Secrecy Act & other regulations. For two years the Bassett's were going through an average of $70,000 per month, both in credits and debits, with many strange transactions that were clear red flags. Also Mr. and Mrs. Bassett should have been well questioned & things thoroughly apprised before being given home refinancing's, as to their income sources, tax forms, **any other loans owed to any other banks, etc, & regarding their paying off such large loans so quickly (and then repeatedly, whether they were loans from National Bank of Middlebury or another financer.)** All of these were clear red flags and cautions which should have resulted in great care being put into assessing the situation, with further reports to proper authorities being given. For the protection of the community, the wider public, as well as the banks other customers (which includes Bruce), this (not ignoring red flags and thorough care as per the presented situation) is critical and necessary. Without such, fraud is enabled and promoted and lives and communities are impaired to ill effect, **and we seek full discovery to find out to what degree proper protocols and laws were thus followed**. We certainly already know that regarding the home refinancing's given them, **that much of this care was not attended to, or they would not have received all these loans**. The entire picture of large sums going both in and out of an account (particularly in the way it is presented in the bank records) with all of these home refinancing loans paid off so quickly, and the general story & admissions of the Bassett's & their extreme avoidance of responsibility for admitted fraud (along with the fraudulent conveyances of asset's to family members which they had denied having and their attempt to complete their fraud via Bankruptcy discharge) all presents as a classic ponzi scheme, a securities fraud ponzi scheme. (& there is no way Larry Bassett lost all the money we gave him, let alone all he claims to have "lost" in general, simply in trading, no matter how poorly he was trading.) As such, it must be understood that Larry Bassett could not have succeeded in his plans of defraudment for so long nor so "well", had there been more responsible attention given the situation, meaning above all with the home refinancing's, which enabled Larry Bassett to continue his fraudulent scheme before we ever were fooled into investing with him. Had the Bassett's not been given all these refinancing loans, their fraud plans and activities would have

been greatly impaired and slowed, if not stopped altogether, (and yes it being stopped altogether could possibly have occurred had things been properly assessed and responded to.) We have no evidence that Larry Bassett could have continued his ponzi scheme fraud had they had no help and complicity from the National Bank of Midddlebury and other financers. We have evidence that it was enabled and forwarded as such.

**26)** We further seek the general discovery about what happened to our funds & where our money went after being given to Mr. Bassett, discovery that was denied us when Mr. and Mrs. Bassett put our Vermont Federal Court case on stay by filing for Bankruptcy in Texas. For all we know Larry may have transferred much of it (quickly or slowly) from the brokerage firm off to somewhere else (and theoretically he could have been cycling it from the brokerage house back to the bank and then to somewhere else completely, none of this is known.)

**27)** In light of the founding documents of this country, to which all law, lawmakers, lawyers, and Courts are beholden, we do need and are owed such discovery. We have been forced to work nearly full time for nearly three years, studying the law, writing documents, talking to lawyers, private investigators, certified fraud examiners and many others, (and this amidst the chronic illness of Lyme disease, in what has been an exhausting and traumatic situation) and for us the damage has been extremely significant & severe. Since we have no guarantees that we will ever receive productive help from **any** government agency & the Vermont Securities Division (& Texas Securities Division) says they cannot disclose information on their investigation until it is complete, and we have no idea how much actual time is actually being given our case by any government bureau (who all plead needing to be equally tight lipped and thus give no help to our current efforts as greatly effected victims of this fraud) , according to the founding documents of this country which  give due process as a right, not a privilege, we must be allowed the full scope of discovery to help ourselves find what happened to our funds, & must be able to defend ourselves from serious negligence & lack of proactive & ethically called for responsibility on the part of a banking institution.

# CAUSES OF ACTION

### Aiding and Abetting: Fraud, Fraudulent Inducement, Fraudulent Misrepresentation, & Ponzi Scheme Securities Fraud

Larry Bassett admitted to us originally in February 2017, (& to other investors) and then under oath at Creditor's Meetings in Bankruptcy Court in

Tyler, Texas, to taking our funds for day trading, having contracts with us, & to having given falsified, dishonest monthly written earning reports as well as having falsified IRS 1099 INT's, that he was reporting earnings to investors while he was in fact losing money in trading & that he kept throwing money into the market to try to regain from losses, without investors knowledge or consent, & in admitted violation of his claimed and promised low risk approach to trading.

Larry Bassett **did admit under oath** at two Creditors meetings in Tyler, Texas Bankruptcy court, to serious felonies, to having given the investors and Mr. Marshall specifically, falsified monthly earning reports (and many verbal as well) and falsified IRS 1099 INT forms, and that he kept throwing money into the market to try to regain from losses when he was in fact losing in trading, all without investor's knowledge or consent. Larry admitted under oath to having given us two promissory notes in March 2017 (one emailed and one signed and postal mailed) for $238,198 & Larry admitted that due to the payment from a percentage of their house sale proceeds in May 2017, of $27,000, the amount he still owed us was $ 211,198 , as we have been paid nothing since that time, (all the promises to repay us from Mr. and Mrs. Bassett have unfortunately come to naught.) Under oath all of this was admitted by Larry and Karen Bassett, this which equates to very serious felonies on the part of Mr. Bassett. **We do have transcriptions of these two Creditors meetings.**

As already stated, the Bassett's did also admit under oath to refinancing their house for the purpose of repaying investors and having more funds for Larry to throw into the market, to try to regain from his losses in trading. One does not seek loans to repay investors due to losses when one is not losing and is making the funds one is reporting to their investors, so we do know Mr. Bassett was losing in trading before we ever invested with him, and thus we were lied to from the start by Larry about his long time safe and successful trading record (garnering 13-15% he had said) and the low risk, conservative trading technique he employed, with stop loss orders to protect from losing below a certain amount, & that he never put all the investors money in at once, & that "This is my families money, I would not risk it." This was fraudulent inducement & fraudulent misrepresentation & the words of someone involved in a securities fraud ponzi scheme.

Larry Bassett gave us false and deliberately deceitful information, which we relied on in making our decision to invest with him and to continue investing, and we thus suffered very serious damages.

Had the National Bank of Middlebury followed through on certain legal and ethical responsibilities regarding the Bassett's, Mr. Bassett's ponzi scheme would surely have been greatly impaired and possibly stopped altogether. We have no evidence it

would have continued and certainly not at the level it did, had they not been thus enabled in fraud by the National Bank of Middlebury. We are needing full discovery to find out exactly what happened with the Bank in their dealings with and regarding the Bassett's, and yes, perhaps some things were attended to, yet it is apparent other things were not and yet other things can be inferred from intrinsic and extrinsic facts and circumstances, that appropriate due diligence was in fact neglected.

We do see that it if there was a lack of reporting of red flags from the activity in the Bassett's joint account, and/or a lack of following all applicable protective laws as regards preventing such fraud, which we have reason to believe is so, that this indeed enabled and helped forward the Bassett's fraud.

Further, it is clear to us that responsible due diligence was not done in respect to the Bassett's refinancing's of their Cornwall, Vermont home, which did indeed in effect enable, aid and forward Mr. Bassett's ponzi scheme.  This neglect in what is a civic duty to the community at large, did play a key role in the fraud perpetrated on us. Without such protections and responsibility held to as a necessary part of a bank's day to day inherent duties and needs, fraud is promoted to the detriment of countless people and the wider Vermont community, not to mention the rest of the United States, since we all are woven together in both unforeseen and obvious ways. That Bruce also has had an account with the National Bank of Middlebury is worth noting, and though he did not use this bank in his investment checks to Larry Bassett, it goes without saying that in a bank not attending to certain vigilance required, to certain lawful responsibilities in respect to those seeking home refinancing's (above all, although we refer here to the whole situation) that the bank would ultimately have no way of knowing who may be harmed by this disregard, including who of their own customers may be harmed. Ultimately all such interconnections cannot be known yet can be guessed, that repercussions from such neglect could in fact hit one of their own customers, as well as anyone else in the wider community. Citizens of Vermont and this country do have need of such basic protections or the foundational & critical elements of true civilization are eroded and lost. For these reasons honoring of such necessary helm taking initiative & answerability, is critical.

The Bank Secrecy Act (BSA, also known as the Currency & Foreign Transactions Reporting Act, requires financial institutions in the U.S. to assist U.S. government agencies in preventing and detecting money laundering and fraud, & thus it requires financial institutions to keep various records & file reports if transactions exceed $10,000 (currency transaction reports) and due to various red flags that can signify abuses such as money laundering, tax evasion or other criminal activities (suspicious activity reports.)


(& again, we are seeking much discovery in general, with this suit, to find out what happened to our funds.)

■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

### Aiding and Abetting: Breach of Fiduciary Duty & Breach of Covenant of Good Faith & Fair Dealing

Plaintiff restates and incorporates the allegations and facts above as if fully incorporated herein. Larry Bassett, (and after the May 2017 notarized contract with Larry and Karen Bassett was signed under notarization, Karen Bassett as well) had a fiduciary duty to the Plaintiffs at all times since their initial investment with Mr. Bassett, and the National Bank of Middlebury enabled and through an egregious negligence forwarded Mr. Bassett's defraudment schematic.

As Marshall & Weir's friend Tameron Josbeck wrote in 2017, "*An agreement between people, even if not legally binding, is none the less the foundation of society. When someone gives their word, it creates a bond, and if that bond of trust is broken, it harms everyone, both those who were betrayed and those who committed the betrayal.....As participants in the new age culture, it is important that each of us see our actions and our lives as manifestations of the higher ideals we hold dear. Upholding agreements and remaining true to our word is all the more important when it is not backed up by legal documents, the exchange of money or the threat of force, because it is exactly then that the value of our word is revealed. Without the systems set up in conventional mainstream culture to enforce contracts, our word must stand on its own. When we are true to our word, we express that commitments are valued and that the bonds of friendship were formed in good faith. By breaking our word, all future bonds and friendships are put in jeopardy of being ignored as well. We must honor the bonds of community and treat all people with respect, for this is what will lead to the best outcome in the long run.*"

This expresses the reality that we are dealing with issues of ethics and what is truly fair and of good faith, character and fair dealing, (not simply arbitrary and changeable rules) which citizens of the state of Vermont (and of this country generally) do rely on with financial institutions who through their choices of responsibility or grievous negligence, of honest assessment or complicity, thereof do affect citizens real lives in serious ways, for better or for worse.

### Unjust Enrichment

Plaintiff restates and incorporates the allegations and facts above as if fully incorporated herein. Through lack of full attention to grave responsibilities involving activities with Larry and Karen Bassett, the bank was unjustly enriched through what was chosen serious negligence.

## Aiding and Abetting Intentional Infliction of Emotional Distress

Plaintiff restates and incorporates the allegations and facts above as if fully incorporated herein. Again, through disregard of highly critical responsibilities with banking activities of Larry and Karen Bassett, the bank enabled and opened the way for Mr. Bassett's intentional infliction of emotional distress, & Plaintiffs have suffered much from this intentionally egregious defraudment.

## Plea For Relief

Plaintiffs seek full discovery for information regarding what happened to our funds invested with Larry Bassett, including discovery of the role and actions or lack thereof of the National Bank of Middlebury, & we and seek damages payment for restoration of what has been lost.

In our first draft of this Complaint we wrote "Further, we need to amend this Complaint, as much has been left out & we need to file it today. Due to various pressing factors (all coalescing at once) such as serious illness, we are behind with this, and the Court is closing early today due to snow, so we ask for time to amend it as this is needed. Thank You very much" and we are amending this now, although due to continual serious illness and numerous other unavoidable responsibilities, we have been behind time-wise & logistically & are thus not yet prepared for the **full amending** we intended, wanted, have been working toward & have needed. Yet since the National Bank of Middlebury has as of yet not filed an "answer" to our Complaint and their deadline is tomorrow, we are adding the following as we are unclear as to what may happen if we don't.

We ask specifically for $3,000,000 in damages payment due to what was originally lost and the seriousness of the picture overall, the level of trauma, the massive time we have been forced to put into dealing with this case on our own in the last three years of almost full time work of studying the law & fraud, communicating with private investigators, lawyers, fraud examiners, forensic accountants, those of government bodies and many, many others.  Although we are resilient people, the level of trauma incurred from this experience has been very large and this has taken quite a toll on our lives and been an incredible waste of time and energy, meaning it has been wasting our lives. It has been denying us time for much that has been left seriously neglected in the fabric of our lives. In our Complaint against Larry and Karen Bassett, filed in late 2018, we asked for treble damages due to all of these reasons & since that time the situation has only worsened & taken much more time,

required our studying bankruptcy law & in fact driving to Texas for a trial, which left Jeanine very sick and vomiting on much of the drive home. This is only a small slice view of what has been an overwhelming situation in which the damages have been severe. Egregious negligence and a chosen blind looking the other way on the part of a financial institution, aiding and abetting through either negligent complicity and/or, cognized conscious complicity, has very serious repercussions for citizens of this state of Vermont and of the United States generally, who are under the law and protections of the founding documents of this country and we do remand back to these foundational documents, to which all laws, lawyers, Judges and Courts are beholden. In their protection we do abide.

We also seek to more fully amend this complaint later, particularly if the Defendants, National Bank of Middlebury, do file an "answer" to this complaint.

***

**Rule 15. Amended and Supplemental Pleadings**

(a) Amendments Before Trial.

(1) *Amending as a Matter of Course*. A party may amend its pleading once as a matter of course within:

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(2) *Other Amendments*. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

(3) *Time to Respond*. Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

***

We further seek a granting of any such further relief as the Court may deem just and equitable.

Thank You

Bruce Marshall & Jeanine Weir
In Proper Personae

P.O. Box 45
Rochester, Vermont 05767