UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Bruce Marshall and Jeanine Weir,

      Plaintiffs,

      v.                                                          Civil Action No. 5:19–cv–246

National Bank of Middlebury,

      Defendant.

## REPORT AND RECOMMENDATION
(Doc. 36)

Plaintiffs Bruce Marshall and Jeanine Weir, appearing *pro se*, have filed this action against Defendant National Bank of Middlebury (NBM) for losses they sustained after Marshall invested approximately $200,000 with Larry and Karen Bassett, who were customers of NBM. In their Third Amended Complaint (TAC), Plaintiffs describe a Ponzi scheme in which Larry Bassett accepted over a million dollars from friends and relations and lost it all through day-trading.  (*See* Doc. 30.)  Plaintiffs claim NBM improperly overlooked the Bassetts' obviously suspicious transactions and fraudulent financial activity, resulting in great financial loss and emotional damage to Plaintiffs.  (*Id.*)  Plaintiffs seek $9,000,000 from NBM, as well as "full discovery" and "whatever other relief the Court deems just [and] equitable."  (*Id.* at 187, ¶ 5.)

Before filing this lawsuit, Plaintiffs filed a separate action against the Bassetts themselves, but that action has been stayed due to the Bassetts' bankruptcy filing in the Eastern District of Texas on February 12, 2019.  *See Marshall v. Bassett*, No. 5:18-cv-196-gwc (D. Vt. Nov. 19, 2018), ECF No. 26 (Feb. 21, 2019).

Pending before the Court is NBM's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. 36). For the reasons explained below, I recommend that the Court grant the Motion in its entirety and dismiss this lawsuit.

## Factual and Procedural Background

Both the Court and the parties have summarized the background facts and procedural history in this case on numerous occasions. (*See, e.g.*, Docs. 1, 5, 27, 31, 36, 46, 50.) The facts discussed below are primarily taken from Plaintiffs' TAC (Doc. 30), and are accepted as true for purposes of ruling on the pending Motion to Dismiss Third Amended Complaint (Doc. 36). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## I.      Relevant Facts

In September 2014, at a time when Weir was suffering from Lyme disease and Marshall was her full-time caregiver, Marshall began investing with Larry Bassett (Bassett), a certified public accountant. (Doc. 30 at 8–10.) Bassett assured Plaintiffs that he was "very conservative" in his investment approach and that he "d[id] well even in and especially in unstable and fluctuating market conditions." (*Id.* at 9, ¶ 15.) Upon receiving positive monthly earning reports and IRS 1099 INT reports, Marshall believed his initial investment of $10,000 with Bassett was "safe," and thus continued to provide funds to Bassett over the next approximately two years, ultimately totaling $197,000. (*Id.* at 10, ¶ 17.) During that period, Bassett never mentioned anything to Marshall about having "any struggles with trading." (*Id.* at 21, ¶ 39.) Plaintiffs received their last monthly earning report from Bassett in November 2016 (*id.* at 10, ¶ 19); and in February 2017, Bassett informed Plaintiffs that he "had lost all of the investors['] money," totaling over $1.2 million (*id.* at 11, ¶ 20). Bassett explained that he had given Marshall and

other investors false monthly earning reports and false IRS 1099 INT forms, and had reported earnings to investors while he was in fact losing in trading.  (*Id.* at 14, ¶ 27; *id.* at 34.)  Plaintiffs were shocked and devastated.  (*Id.* at 11, ¶ 21.)

The Bassetts told Plaintiffs they were committed to repaying them and other investors. (*Id.* ¶ 22.)  Though the Bassetts stated they had no assets, they advised that they would sell their Vermont home, move in with family in Texas, and work full-time jobs in order to earn money to pay back the lost funds.  (*Id.* at 11–12, ¶ 22.)  The Bassetts estimated that it would take five or more years to repay the debt.  (*Id.* at 12, ¶ 23.)  In fact, the Bassetts' representation that they had no assets was not true; they had intentionally misrepresented their financial situation in an effort to prevent Plaintiffs and other investors from taking timely legal action against them.  (*Id.* at 12, ¶ 22; *id.* at 31, ¶ 60.)

In March 2017, Bassett sent Plaintiffs a Promissory Note in favor of Marshall in the amount of $238,198.  (*Id.* at 16, ¶ 32; *see id.* at 141, ¶ 36 (referencing "two promissory notes," "one emailed and one signed and postal mailed").)  In May 2017, however, Bassett told Marshall that Bassett and his wife had only $133,000 and that he had lied about the equity they had in their Cornwall, Vermont house.  (*Id.* at 23, ¶ 43.)  Marshall placed liens against the Cornwall house in the amount of $197,000, the total amount he had invested with Bassett.  (*Id.*)  On May 15, 2017, the liens were released due to a "contractual Agreement" between the Bassetts and Plaintiffs, in which the Bassetts agreed to repay all funds owed Marshall, to give "full financial disclosure" to Plaintiffs regarding the sale of the Bassetts' Cornwall house, and to use an escrow service for the house sale and all future payments to investors.  (*Id.* at 24, ¶ 48.)  The Bassetts' house was sold (*id.* at 23, ¶ 43), and the mortgage company gave Marshall a check for $27,000 as partial payment towards his lost investment (*id.* at 24, ¶ 48).  That $27,000 check constitutes the

only funds the Bassetts have paid to Plaintiffs against their outstanding $197,000 debt.  (*Id.* at 44, ¶ 96.)  The Bassetts then moved to Texas, where they filed for bankruptcy approximately two years later.  *See Marshall*, No. 5:18-cv-196-gwc, ECF No. 26.

Pursuant to Plaintiffs' and the Bassetts' May 15 Agreement, later in 2017 the Bassetts provided to Plaintiffs "bank statements from their joint checking account with [NBM]."  (Doc. 30 at 24, ¶ 49.)  According to Plaintiffs, these records included "alarm bells" and "red flags" that should have demonstrated to NBM "clear criminal activity," leading the Bank to "freeze [the Bassetts'] accounts until certain questions were answered."  (*Id.* at 25.)  More specifically, Plaintiffs allege that the Bassetts' NBM records reveal "very obvious money laundering with 'stacking' and with numerous money wires, . . . [and] an average of $60,000 to $70,000 per month going both in [and] out of their account . . . for two years."  (*Id.* ¶ 51.)  Given this activity, Plaintiffs claim the "[b]anking financial professionals [at NBM] clearly knew" that the Bassetts were laundering money (*id.*) and should have reported the situation to "law enforcement" (*id.* at 30, ¶ 58.)  Had NBM done so, Plaintiffs assert that "the Bassett[s'] fraud would [not] have . . . survived until 2014 when [Plaintiffs] first heard of Larry Bassett."  (*Id.* at 54, ¶ 121.)  According to Plaintiffs, the Bassetts' Ponzi scheme "could not have happened" without NBM's involvement.  (*Id.* at 81, ¶ 182; *see id.* at 64–65.)

In addition to obtaining the Bassetts' bank statements from NBM, Plaintiffs also obtained records filed with the Cornwall Town Clerk's Office in 2018, which led to their "alarming" discovery of "a number of home refinancing loans, new mortgage loans [that the] . . . Bassett[s] had obtained with their Cornwall house used as collateral, significant loans which they paid off quickly and in close succession."  (*Id.* at 43, ¶ 93.)  Plaintiffs' review of the Cornwall records revealed that the Bassetts refinanced their home with home equity loans ten times between the

years 2001 and 2017, that $800,000 of the funding for those loans was from NBM, and that the

Bassetts paid off those loans "in very short order," "sometimes in less than [one] year." (*Id.*

at 51, ¶ 116.)  Moreover, in 2005, the Bassetts obtained a $300,000 home equity loan from

Ameriquest, which they paid off in August 2006. (*Id.* at 140, ¶ 35.)  The Bassetts obtained

another home equity loan from NBM in October 2006. (*Id.*)  Plaintiffs allege that NBM should

not have provided these loans to the Bassetts. (*Id.*)

According to Plaintiffs, the Bassetts engaged in their Ponzi scheme with "ill will,

malice[,] and a deliberate choice to defraud." (*Id.* at 54, ¶ 122.)  The Bassetts were "extremely

studied" in their "manipulative abilities," and acted with "pre[]meditated intent to defraud in a

very specific and pre[]planned way." (*Id.* ¶ 123.)  Their Ponzi scheme included the following

elements:

- "falsified monthly written earning reports and falsified IRS 1099 INT[]s";

- "two years of bank records showing obvious and continual criminal activity, with . . .
  approximate[ly] . . . $60,000–$70,000 per month going both in [and] out of their
  account";

- "obvious 'stacking'";

- "clear money laundering"; and

- "significant new mortgages/home equity loans . . . [that were] paid off quickly and in
  quick succession, totaling $1,743,450 paid off over 17 years."[1]

(*Id.* at 55, ¶ 123.)

---

[1] According to Plaintiffs, the Bassetts admitted under oath at creditors meetings in Bankruptcy Court that these home equity loans "had been obtained to repay investors." (*Id.* at 55; *see id.* at 141–42.)

Plaintiffs claim there were "many" "clear red flags" that NBM should have reported under the Bank Secrecy Act, other regulations, and ethics rules.  (*Id.* at 56, ¶ 126.)  According to Plaintiffs, if they, as laypeople and not banking professionals, could see the criminal nature of the Bassetts' bank activity, NBM, whose job it is to notice fraudulent financial activity, "must have been and in fact was" aware of the illegal activity occurring in furtherance of the Bassetts' Ponzi scheme.  (*Id.* at 92, ¶ 200.)  Plaintiffs state that the Bassetts' NBM bank records were "blatantly and obviously criminal in nature" (*id.*), and thus it is "preposterous" to believe that NBM was unaware of the Bassetts' unlawful use of their NBM bank account (*id.* at 93, ¶ 202). Specifically, Plaintiffs claim NBM "knew" that all the mortgage loans the Bassetts had received through NBM were "problematic."  Given this knowledge, NBM should not have made the loans to the Bassetts.  (*Id.*)

On May 2, 2018, Plaintiffs filed a complaint against the Bassetts with the Vermont Securities Division.  (*Id.* at 36, ¶ 74.)  Plaintiffs have also submitted complaints to the FBI, the IRS, and the Vermont Board of Professional Regulation "in [their] quest for justice and recovery of [lost] funds."  (*Id.* at 52, ¶ 117.)

## II.     Procedural History

On December 30, 2019, Plaintiffs filed a nine-page Complaint with the Court, alleging the following causes of action: (1) aiding and abetting fraud, fraudulent inducement, fraudulent misrepresentation, and Ponzi scheme securities fraud; (2) aiding and abetting breach of fiduciary duty and breach of covenant of good faith and fair dealing; (3) unjust enrichment; and (4) aiding and abetting intentional infliction of emotional distress.  (Doc. 1.)  Plaintiffs requested discovery and a jury trial.  (*Id.* at 1, 8.)  On January 22, 2020, before NBM filed a response, Plaintiffs filed an eleven-page Amended Complaint, alleging the same causes of action as in the original

Complaint and again requesting discovery and a jury trial.  (Doc. 2.)  On February 12, 2020,

NBM filed a Motion to Dismiss the Amended Complaint for failure to state a claim pursuant to

Federal Rule of Civil Procedure 12(b)(6), arguing that the Amended Complaint failed to identify

violations of any banking requirements or any facts that would support a conclusion that NBM

knew of the Bassetts' fraud or assisted in it.  (Doc. 14.)

The Court granted Plaintiffs' three motions seeking an extension of time to respond to

NBM's Motion to Dismiss (*see* Docs. 17, 21, 24), but Plaintiffs did not file a response to the

Motion.  Instead, on September 4, 2020, Plaintiffs filed a 173-page Second Amended Complaint,

and a motion requesting permission to file a third amended complaint.  (Docs. 27–28.)  The

Court granted Plaintiffs' motion (Doc. 29); and on September 8, 2020, Plaintiffs filed the

188-page TAC (Doc. 30), which is the operative complaint in the case.

Plaintiffs plead the following causes of action: (1) aiding and abetting fraud (*id.* at 129);

(2) aiding and abetting money laundering (*id.* at 164); (3) aiding and abetting intentional

infliction of emotional distress (*id.* at 168); and (4) aiding and abetting breach of fiduciary duty

and breach of the covenant of good faith and fair dealing (*id.* at 174).  In addition, although not

explicitly pled, the TAC references possible causes of action for unjust enrichment, violations of

the Bank Secrecy Act and the Securities Exchange Act, and common law negligence.  In the Plea

for Relief, the TAC seeks $9,000,000 in damages (*id.* at 187, ¶ 5), "full discovery [of]

information regarding what happened to [Plaintiffs'] funds" (*id.* at 186, ¶ 1), and "whatever other

relief the Court deems just [and] equitable" (*id.* at 187, ¶ 5).

On September 25, 2020, NBM filed its Motion to Dismiss under Federal Rule of Civil

Procedure 12(b)(6).  (Doc. 36.)  After receiving two extensions of time to file a response (*see*

Docs. 38, 39, 41, 46), on January 8, 2021, Plaintiffs filed a 16-page Response to NBM's Motion

(Doc. 49). A few days later, Plaintiffs filed a 27-page Amended Response to the Motion (Doc. 50),[2] which the Court agreed to accept for filing approximately two weeks later (*see* text-only Order 53).[3] NBM filed its Reply on January 22, 2021. (Doc. 52.)

## Analysis

NBM contends that the TAC should be dismissed because it fails to adequately plead any causes of action against NBM, instead pleading conclusory statements and recitals of the elements of each alleged cause of action. (Doc. 36.)

## I.    Standard of Review Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "provide the grounds upon which [its] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A plaintiff must also allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As the Supreme Court explained in *Iqbal* and *Twombly*, this does not require a plaintiff to provide "detailed factual allegations" to support its claims, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."

---

[2] Plaintiffs' Amended Response does not contain pages 19 and 20. (*See* Doc. 50.) Given Plaintiffs' substantial written filings in this case, however, the Court determines that it has the necessary information to render a Report and Recommendation on the legal sufficiency of Plaintiffs' claims.

[3] Plaintiffs' Amended Response (Doc. 50) exceeds the maximum page length for an opposition to a dispositive motion. *See* Local Rule 7(a)(4)(A) (mandating that "a memorandum . . . opposing a dispositive motion must not exceed 25 pages, excluding exhibits and attachments"). Given that Plaintiffs are conducting this action without assistance of counsel, the Court has considered the Amended Response in its entirety to ensure that Plaintiffs have a full opportunity to present their position.

*Iqbal*, 556 U.S. at 678.  If the plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

In assessing the adequacy of the pleadings, the court must accept all factual assertions as true and draw all reasonable inferences in favor of the plaintiff. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011); *ATSI Commc'ns*, 493 F.3d at 98.  The court need not, however, credit the complaint's "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678; *see also Faber v. Metro. Life Ins.*, 648 F.3d 98, 104 (2d Cir. 2011) ("We are not . . . bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." (internal quotation marks omitted)).

Even after *Iqbal* and *Twombly*, the court must construe a *pro se* plaintiff's complaint "liberally," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), reading it "to raise the strongest arguments . . . suggest[ed therein]," *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (internal quotation marks omitted).  "This policy of liberally construing *pro se* submissions is driven by the understanding that [i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (alteration in original) (internal quotation marks omitted).  Thus, in assessing *pro se* complaints under Rule 12(b)(6), courts "apply[ ] a more flexible standard to evaluate their sufficiency than [they] would when reviewing a complaint submitted by counsel." *Lerman v. Bd. of Elections*, 232 F.3d 135, 140 (2d Cir. 2000). Nonetheless, even *pro se* litigants "remain subject to the general standard applicable to all civil complaints under the Supreme Court's decisions in *Twombly* and *Iqbal*." *Brickhouse v. City of*

*New York*, No. 09 CIV. 9353(NRB), 2010 WL 3341845, at *2 (S.D.N.Y. Aug. 16, 2010); *see*

*Bisson v. Martin Luther King Jr. Health Clinic*, No. 07-5416-cv, 2008 WL 4951045, at *1

(2d Cir. Nov. 20, 2008); *Triestman*, 470 F.3d at 477 ("*[P]ro se* status does not exempt a party

from compliance with relevant rules of procedural and substantive law." (internal quotation

marks omitted)).

## II.    Aiding and Abetting Claims Generally

All four of the causes of action that are explicitly pled in the TAC allege that NBM aided

and abetted the Bassetts in their alleged Ponzi scheme to defraud Plaintiffs.  Under Vermont law,

the claim of aiding and abetting another in the commission of a tort includes the following

elements: "(1) the existence of a primary violation; (2) knowledge of this violation on the part of

the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of

the primary violation."  *Montgomery v. Devoid*, 2006 VT 127, ¶ 20, 181 Vt. 154, 164, 915 A.2d

270, 278 (2006) (quoting *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003)); *see*

*Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) (securities claim); *Lerner v. Fleet Bank,*

*N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (fraud claim).  The Vermont Supreme Court has adopted

the Restatement (Second) of Torts § 876 in its consideration of the claim of "aiding and abetting

another in the commission of a tort."  *Goldberg v. Saint-Sauveur Valley Resorts, Inc.*, Case No.

2:17-cv-00061, 2018 WL 8370060, at *15 (D. Vt. Dec. 20, 2018).  In relevant part, the

Restatement provides that an individual may be liable if he "knows that [an]other's conduct

constitutes a breach of duty and gives substantial assistance or encouragement to th[at] other

[individual] so to conduct himself."  Restatement (Second) of Torts § 876 (1979).

### III.    Aiding and Abetting Fraud Claim

In addition to pleading the elements of a claim for aiding and abetting, Plaintiffs' aiding and abetting fraud claim "must also satisfy the heightened pleading standard set forth in Fed. R. Civ. P. 9(b) which requires a claimant to plead the circumstances that allegedly constitute fraud with particularity[.]"  *Goldberg*, 2018 WL 8370060, at *14 (alteration in original) (internal quotation marks omitted) (quoting *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014)); *see Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) ("It is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.").  Rule 9(b) essentially places "two further burdens" on a plaintiff alleging fraud: the first regarding the pleading of the circumstances of the fraud, and the second regarding the pleading of the defendant's mental state.  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).  The complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Id.* (internal quotation marks omitted).  Although Rule 9(b) allows that the defendant's malice, intent, knowledge, and other mental states be alleged generally, the plaintiff still must allege facts "that give rise to a strong inference of fraudulent intent."  *Id.* (quoting *Lerner*, 459 F.3d at 290–91); *see Bergman v. Spruce Peak Realty, LLC*, 847 F. Supp. 2d 653, 674 (D. Vt. 2012).

Under Vermont law, the elements of common law fraud are: "(1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party act[ed] in reliance on that fact; and (5) is thereby harmed."  *Goldberg*, 2018 WL 8370060, at *15 (alteration in original)

(quoting *Felis v. Downs Rachlin Martin PLLC*, 2015 VT 129, ¶ 13, 200 Vt. 465, 472, 133 A.3d 836, 842). Where an omission rather than a misrepresentation is the basis for the alleged fraud, the plaintiff must also demonstrate that the defendant had a duty to disclose. *See Estate of Alden v. Dee*, 190 Vt. 401, 415, 35 A.3d 950, 961 (2011) ("Fraudulent misrepresentation can be accomplished affirmatively by false statement or by the concealment of facts by one who has a duty to disclose those facts."). In that situation, "[t]he duty to disclose arises out of a special relationship of confidence or trust—such as the fiduciary relationship between trustee and beneficiary." *Lewis v. Bellows Falls Congregation of Jehovah's Witnesses*, 95 F. Supp. 3d 762, 771 (D. Vt. 2015) (quoting *Estate of Alden*, 190 Vt. at 415).

Applying these principles here, I find that the TAC fails to plead facts sufficient to establish that NBM had actual knowledge of the Bassetts' fraudulent activity and substantially assisted the Bassetts in such activity.

### A.    Actual Knowledge

To establish the "actual knowledge" element of aiding and abetting, "[p]laintiffs must allege that the defendant had actual knowledge of the wrongful conduct committed, not simply that the defendant should have known of the conduct." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010) (citing *Rosner v. Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009) ("*Rosner II*")). Even in cases where the complaint alleges that the defendant had actual knowledge of the fraudulent conduct, dismissal is appropriate when the factual allegations do not "give rise to the 'strong inference,' required by Federal Rule of Civil Procedure 9(b), of actual knowledge" of the improper conduct. *Lerner*, 459 F.3d at 293.

For example, in *In re Agape Litig.*, 773 F. Supp. 2d 298 (E.D.N.Y. 2011) ("*Agape II*"), investor plaintiffs accused Bank of America (BOA) of aiding and abetting the fraud of Nicholas

Cosmo (and his Agape companies), who had orchestrated a Ponzi scheme to the investors'

financial detriment.  According to the complaint, BOA had "effectively established an unofficial

branch within Agape headquarters," from which it managed Agape's accounts and had "access to

Agape's business records and personal contact with Agape employees, including Cosmo."  *In re

Agape Litig.*, 681 F. Supp. 2d 352, 358 (E.D.N.Y. 2010) ("*Agape I*").  Moreover, a BOA

representative had "endorsed Agape and Cosmo," telling an investor that Agape was a

"wonderful company" and Cosmo was a "great guy."  *Id.* (internal quotation marks omitted).

The court in *Agape II* held that the plaintiffs' allegations of "red flags"—including wire transfers

totaling $100 million or more, personal payments to Cosmo, interest payments to certain

investors, and payments to brokers—and other "suspicious circumstances, which in hindsight

may appear to indicate the obviousness of the fraud," failed to rise to the level of specificity that

courts in the Second Circuit require before holding that a plaintiff has sufficiently alleged facts

raising a strong inference of actual knowledge from circumstantial evidence.  *Agape II*, 773 F.

Supp. 2d at 318–19; *see Agape I*, 681 F. Supp. 2d at 358–59.  The court explained that

"[s]tatements alleging that . . . a defendant '*should have known* that something was amiss with [ ]

transactions,' even if pled with conclusory statements that the defendant '*actually knew*

something notwithstanding . . . [are] insufficient to support an aiding-and-abetting claim.'"

*Agape II*, 773 F. Supp. 2d at 308 (emphases added) (second omission and second and third

alterations in original) (quoting *Rosner II*, 349 F. App'x at 639); *see Renner v. Chase Manhattan

Bank*, No. 98 CIV. 926(CSH), 2000 WL 781081, at *8 (S.D.N.Y. June 16, 2000) (2d Cir. 2004)

("*Renner II*") (holding that, "[a]t most, [the plaintiff] is entitled to the inference that [the

defendant bank manager] should have known that there was the possibility of fraud[;] [b]ut what

[the defendant bank manager] should have known is irrelevant[, as] [t]he law is only interested in what he actually knew"), *aff'd*, 85 F. App'x 782.

The court reached a similar conclusion in *Nigerian National Petroleum Corporation v. Citibank N.A.*, No. 98 Civ. 4960(MBM), 1999 WL 558141 (S.D.N.Y. July 30, 1999). There, the plaintiff sought to recover from Citibank funds it claimed to have lost as a result of fraud by third-party Alberto Vadra, who had several bank accounts with Citibank. *Id.* at *1. According to the complaint, Citibank had "swiftly processed" Vadra's wire transfer of approximately $15 million, despite the transfer being "riddled with inconsistencies and other badges of fraud," including "typographical errors and incomplete addresses." *Id.* (internal quotation marks omitted). Moreover, the complaint alleged that, following Vadra's instructions, the bank had made many million-dollar wire transfers to and from Vadra's accounts, and that even after learning that some of these transfers were fraudulent, the bank had failed to freeze any of Vadra's accounts and continued to permit transfers and withdrawals by Vadra. *Id.*

In its consideration of the plaintiff's claims that Citibank "knowingly or recklessly disregarded [these and other] badges of fraud," including irregularities in the opening of Vadra's accounts and in the documents Vadra submitted to verify the wire transfers, the court held that the complaint did not "give[] rise to an inference, let alone a strong inference, that Citibank actually knew of, and participated in, Vadra's fraud." *Id.* at *7 (internal quotation marks omitted). The court recognized that there might have been "several red flags that should have alerted Citibank to Vadra's fraud or at least prompted it to investigate," and that Citibank may have acted negligently in allowing Vadra to make additional wire transfers after the bank had uncovered Vadra's fraud. Nevertheless, it found that the complaint failed to adequately allege that Citibank had "actual knowledge" of the wrongdoing. *Id.* at *8. The court explained that

14

"allegations that a bank disregard[ed] suspicious circumstances which might have well induced a

prudent banker to investigate" do not suffice to state a claim for aiding and abetting fraud. *Id.*

(alteration in original) (internal quotation marks omitted); *see Renner II*, 2000 WL 781081, at *7

(holding that, even where defendant bank manager was allegedly "uneasy" or "suspicious" about

proposed use of bank funds, and where bank manager allegedly "questioned the way in which

the money would be used," court could not assume manager "actually knew that a fraudulent

scheme was in place").

In this case, the TAC includes general allegations that NBM should have noticed "red

flags" regarding the Bassetts' banking activity with NBM, contending that if NBM had noticed

these negative indicators, the Bassetts' Ponzi scheme would not have continued for as long as it

did and would not have resulted in Plaintiffs' loss of investment funds. (*See, e.g.*, Doc. 30

at 24–25 (alleging that bank statements from the Bassetts' joint checking account with NBM

included "alarm bells" and "red flags" that should have demonstrated to NBM "clear criminal

activity," leading the Bank to freeze the Bassetts' accounts); *see also id.* at 64–65, 81.)

These "red flag" allegations do not satisfy the heightened standard of pleading actual

knowledge of fraud. Courts in this Circuit have repeatedly found similar "red flag" allegations

insufficient to demonstrate actual knowledge. *See, e.g.*, *Zamora v. FIT Int'l Grp. Corp.*, 834 F.

App'x 622, 628 (2d Cir. 2020) (holding that alleged "red flags" are "insufficient to impute

knowledge of [fraudulent] scheme to [bank] because, even assuming *arguendo* that they may

have put [bank] on notice that some impropriety may have been taking place, they do not create a

strong inference of actual knowledge of [third party's] outright theft of client funds" (internal

quotation marks omitted)); *Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.*, 18 Civ. 1876

(PAE), 2019 WL 2327810, at *16 (S.D.N.Y. May 30, 2019) (noting courts' wide recognition that

"suspicious patterns of bank transfers, withdrawals, and balances indicative of fraud, while sometimes rising to the level of constructive knowledge," are insufficient to establish actual knowledge in support of a claim for aiding and abetting fraud), *reconsideration denied*, 2019 WL 3252907 (S.D.N.Y. July 19, 2019); *Agape I*, 681 F. Supp. 2d at 364 (holding that, although allegations of "red flags" or other "badges of fraud" "may reflect unfavorably upon [the bank's] fraud monitoring regime, they do not create a strong inference that [the bank] had actual knowledge of [the defendant's Ponzi] scheme"); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 469 (S.D.N.Y. 2008) (holding that, "[e]ven where a bank was on notice of 'red flags' that indicated certain accounts may have been vehicles for fraudulent activity and referred the case to its internal fraud unit, the bank had only suspicions but not actual knowledge of fraud"); *Rosner v. Bank of China*, No. 06 CV 13562, 2008 WL 5416380, at *6 (S.D.N.Y. Dec. 18, 2008) ("*Rosner I*") (finding that allegations of bank's processing of "atypical" and "non-routine" transactions—including "the repeated transfer and nearly daily withdrawal of large sums of cash over the course of several years resulting in the theft of more than $25 million"—did not give rise to a strong inference of actual knowledge), *aff'd*, 349 F. App'x 637 (2d Cir. 2009); *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1246 (M.D. Fla. 2013) ("Cases addressing the liability of banks for Ponzi schemes consistently hold that 'red flags' arising from suspicious activity giving rise to the presumption that the bank should have known about the Ponzi scheme are insufficient to allege aiding-and-abetting liability." (emphasis omitted)); *Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012) ("[A] bank's disregard of 'obvious red flags' such as atypical and non-routine banking transactions were insufficient to establish the conscious awareness of wrongdoing necessary to maintain an aiding and abetting cause of action."), *aff'd*, 749 F.3d 938 (11th Cir. 2014).

Plaintiffs claim in a conclusory manner that the "red flags" surrounding the Bassetts' account activity were so obvious that it can be inferred NBM had actual knowledge of the Bassetts' ongoing Ponzi scheme. (*See, e.g.*, Doc. 30 at 25, ¶ 51 ("These bank records contain what is very obvious money laundering . . . . Banking financial professionals clearly knew what they saw in these records . . . ."); *id.* at 27, ¶ 54 ("This is a MAJOR money laundering case; it was not a few isolated transactions of money laundering but years['] worth of such transactions, *on a continual and repeated basis, with many, many, many red flags obvious on a regular and CONSTANT basis.* NBM did not simply accidentally miss this. They chose not to appropriately deal with it."); *id.* at 92, ¶ 200 ("The fact that we, . . . who are not banking financial professionals, could see the criminal nature of the Bassett[]s['] bank records as soon as we laid eyes on them, further demonstrates how very clear the criminal nature of these records must have been and in fact was, to banking financial professionals who did see these records . . . and for whom it was their [job] to notice such alarm bells and red flags. . . . We . . . had some level of naivete regarding what we were seeing, . . . yet even to us[,] these records were blatantly and obviously criminal in nature, displaying clear and unmistakable criminal activity."); *id.* at 93, ¶ 202 ("To say or believe that banking financial professionals could not see [the Bassetts' criminal activity] is preposterous and unacceptable."); *id.* at 143–44, ¶ 42 ("[I]t would be a lie for NBM to imply or say that they didn't notice [the criminal nature of the Bassetts' bank records, as] it was [NBM's] JOB to notice such alarm bells [and] red flags [and] to report them to [the] . . . authorities . . . .").)

These conclusory allegations do not permit a plausible inference, let alone the "strong inference" required for a fraud claim, that NBM had actual knowledge of the Bassetts' alleged fraudulent conduct. *See Zamora*, 834 F. App'x at 627–28 ("Throughout the Amended

Complaint, Plaintiffs offer consistently conclusory allegations that JPMorgan knew or should have known about the alleged fraudulent conduct.  Such conclusory allegations are flatly insufficient.").  Moreover, the TAC's more specific allegations—including allegations of falsified earning reports and IRS 1099 INT forms, monthly movement of $60,000–$80,000 into and out of the Bassetts' account for approximately two years, and Bassett obtaining several loans and lines of credit secured by equity in his home over the course of a decade and paying off those loans in short order[4]—do not support a claim that NBM knew or should have known about the Bassetts' fraudulent conduct.  For example, there is nothing inherently criminal or even suspicious about a bank customer depositing and withdrawing $60,000–$80,000 from his or her account on a regular basis, particularly when the customer is involved in investment activity.  Although Plaintiffs contend that the criminal nature of the Bassetts' conduct was obvious to Plaintiffs (*see* Doc. 30 at 92, ¶¶ 200–01) and should have been obvious to NBM, the alleged fraudulent conduct did not become apparent to Plaintiffs until Bassett himself informed them in February 2017 that he "had lost all of the investors['] money" (*id.* at 11, ¶ 20).

Plaintiffs cite *Arreola v. Bank of Am., Nat. Ass'n*, No. CV 11–06237 DDP (PLAx), 2012 WL 4757904 (C.D. Cal. Oct. 5, 2012), to argue that "there are an increasing number of private civil suit cases where banks have been held accountable for lack of attention to 'red flags' of suspicious activity going through their bank that were unattended to . . . with a chosen blind eye."  (Doc. 50 at 13.)  However, *Arreola* is distinguishable on its facts.  In that case, a high-level branch manager of the defendant bank accepted bribes from the perpetrator of a Ponzi

---

[4] The TAC alludes to the following additional facts, among others, as indicia of the Bassetts' fraud: (1) the Bassetts' first mortgage loan, in the amount of $50,000, was cosigned by family members; (2) the Bassetts' loan amounts quickly increased to $200,000 and $230,000, and were paid off "in short order," i.e., in "less than a year" (Doc. 30 at 135, ¶¶ 13–17); (3) if Bassett was day trading for others, NBM would have seen transactions going in and out of the Bassetts' account "relative to other people" (*id.* ¶ 19); and (4) the Bassetts had "quite a number of significant mortgages with NBM, worth $800,000, paid off in less than ten years" (*id.* at 134, ¶ 12).

scheme, in exchange for banking assistance that included prematurely releasing on-hold funds before expiration of the required waiting period, falsifying Verification of Deposit forms, and wiring large sums of money to the Ponzi scheme perpetrator's personal accounts in Mexico. *Arreola*, 2012 WL 4757904, at *1–2.  The complaint in *Arreola* alleged that the bank manager "knew, at the very least, that the falsified Verification of Deposit forms were being used in connection with fraudulent mortgage applications," *id.* at 2; and that the defendant bank "knew" of the Ponzi scheme perpetrator's misuse of his accounts, including using them to "transfer[ ] money from investor-funded accounts to [his own] personal accounts in Mexico," *id.* at 3. Plaintiffs do not make similar allegations in this case.  For example, the TAC does not allege that any NBM employee was aware of Bassett falsifying his banking documents or transferring investor funds to his personal accounts in another country.  Nor does the TAC allege that NBM altered its normal banking practices in any way to accommodate the Bassetts' banking activity.

Plaintiffs have not sufficiently plead that NBM had actual knowledge of the Bassetts' fraudulent conduct.

### B.    Substantial Assistance

Even if the TAC alleged facts giving rise to a strong inference of NBM's actual knowledge, Plaintiffs have not sufficiently pled that NBM "substantially assisted" the Bassetts in their alleged fraudulent activity.  Substantial assistance may be found where: "(1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed; and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated."  *Rosner I*, 2008 WL 5416380, at *5 (internal quotation marks omitted); *see Nigerian Nat'l Petroleum*, 1999 WL 558141, at *8.  The Vermont Supreme Court has identified five factors bearing on whether a defendant's conduct rises to the level of

substantial assistance: (1) the nature of the wrongful act; (2) the kind and amount of the

assistance; (3) the relationship between the defendant and the actor; (4) the presence or absence

of the defendant at the occurrence of the wrongful act; and (5) the defendant's state of mind.

*Concord Gen. Mut. Ins. Co. v. Gritman*, 2016 VT 45, ¶ 18, 202 Vt. 155, 163, 146 A.3d 882, 888

(2016) (citing Restatement (Second) of Torts § 876 cmt. d).  Furthermore, Vermont law provides

that a defendant cannot be liable "unless his or her conduct is more than benign and the

defendant actively does something to facilitate another's tortious conduct."  *Id.* (internal

quotation marks omitted).

A financial institution does not substantially assist the perpetration of a fraud simply by

providing banking services.  "The mere fact that participants in a fraudulent scheme use accounts

at [a bank] to perpetrate it, without more, does not rise to the level of substantial assistance

necessary to state a claim for aiding and abetting liability."  *Nigerian Nat'l Petroleum v.

Citibank*, 1999 WL 558141, at *8 (alteration in original) (internal quotation marks omitted).  As

one court has explained, "[t]he caselaw is clear that opening accounts and approving transfers,

even where there is a suspicion of fraudulent activity, does not amount to substantial assistance."

*Agape I*, 681 F. Supp. 2d at 365; *see Ryan v. Hunton & Williams*, No. 99–CV–5938 (JG), 2000

WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) ("The affirmative acts of opening the accounts,

approving various transfers, and then closing the accounts on the basis of suspected fraud,

without more, do not constitute substantial assistance.").

The TAC does not allege that NBM actively assisted the Bassetts to carry out the fraud

scheme.  Rather, Plaintiffs premise NBM's liability on the bank's failure to discover and impede

the Bassetts' alleged Ponzi scheme using NBM accounts, loans, and lines of credit.  But "the

mere fact that participants in a fraudulent scheme use accounts at a bank to perpetrate it, without

more, does not in and of itself rise to the level of substantial assistance." *Rosner I*, 2008 WL 5416380, at \*12 (internal quotation marks omitted). The TAC does not allege a relationship between Bassett and NBM or Marshall and NBM other than the typical bank/customer relationship. The TAC alleges that NBM provided substantial assistance to the Bassetts' Ponzi scheme by ignoring "red flags" and failing to alert the authorities or otherwise disrupt the scheme. However, "[i]naction on the part of the alleged aider and abettor 'ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act.'" *Id.* at \*5 (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)). NBM had no affirmative duty to detect and thwart the Bassetts' alleged fraud, and "[w]hen a defendant has no such duty, their failure to act may not serve as the basis for claiming that the defendant provided substantial assistance." *Agape I*, 681 F. Supp. 2d at 365.

Furthermore, the TAC does not allege that NBM proximately caused Plaintiffs' injuries. *See Rosner I*, 2008 WL 5416380, at \*5 (holding that "an alleged aider and abettor will be liable only where the plaintiff's injury is a direct or reasonably foreseeable result of the defendant's conduct"); *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003) (holding that defendant's affirmative participation in the fraud must be "the proximate cause of [the] plaintiff's injury"); *Lussier v. Bessette*, 2010 VT 104, ¶ 11, 189 Vt. 95, 102, 16 A.3d 580, 585 (2010) (noting that, "[c]losely intertwined with the concept of substantial assistance is the principle of proximate cause" (alteration in original) (internal quotation marks omitted)).

The TAC alleges that but for NBM's provision of loans and lines of credit to the Bassetts, and allowance of the Bassetts to deposit and withdraw funds from their NBM bank account, the Bassetts would not have been able to engage in their Ponzi scheme and defraud Marshall years

later.  (*See, e.g.*, Doc. 30 at 54, 64–65, 81.)  However, "'but[-]for' causation is not sufficient to

establish aider and abettor liability."  *Rosner I*, 2008 WL 5416380, at \*12.  Rather, "the

complaint must allege that the acts of the aider and abettor proximately caused the harm to the

[party] on which the primary liability is predicated."  *Bloor v. Carro, Spanbock, Londin, Rodman*

*& Fass*, 754 F.2d 57, 62 (2d Cir. 1985).  Under Vermont law, "the hallmark feature of proximate

causation, and what distinguishes it from but-for causation, is reasonable foreseeability."  *State v.*

*Baker*, 2017 VT 91, ¶ 10, 205 Vt. 569, 576, 177 A.3d 1093, 1098.  Therefore, "[a]iding and

abetting liability arises only when plaintiffs' injury was 'a direct or reasonably foreseeable

result' of the complained-of conduct.  'But-for' causation does not suffice; the breach must

proximately cause the loss."  *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 249 (S.D.N.Y. 1996)

(citation omitted), *aff'd*, 152 F.3d 918 (2d Cir. 1998); *see Bloor*, 754 F.2d at 63 ("Allegations of

a 'but[-]for' causal relationship are insufficient [to support a claim of aiding and abetting].").

The TAC does not allege that the acts of NBM proximately caused the harm to Plaintiffs.

*See Agape II*, 773 F. Supp. 2d at 325 (holding that, "while the Plaintiffs have alleged that [the

financial institution's] banking activities, structuring of the accounts, and issuance of [a remote

depository system] made it easier for [a Ponzi scheme perpetrator] to effectuate [his] scheme,

these conventional banking transactions were not the proximate cause of the Plaintiffs' damages

and therefore do not constitute substantial assistance").  Although the TAC claims that but for

NBM loaning money and offering lines of credit to Bassett, he would not have been able to

operate a Ponzi scheme resulting in Plaintiffs' lost investment a decade later, the complaint does

not plausibly allege that it was foreseeable to NBM that Bassett would use his NBM bank

account and lines of credit to operate that scheme.  *See Peck v. Counseling Serv. of Addison*

*Cnty., Inc.*, 146 Vt. 61, 64–65, 499 A.2d 422, 425 (1985) (holding that, unless there is a "special

relationship between two persons which gives the one a definite control over the actions of the other," "there is no duty to control the conduct of another in order to protect a third person from harm" (internal quotation marks omitted)).  Moreover, the TAC does not plausibly allege that, had NBM closed Bassett's accounts, he would not have been able to obtain the same financial services from another bank.  *See Edwards & Hanly v. Wells Fargo Secs. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979) (finding no proximate cause where complaint alleged that fraudster "would not have been able to finance or to conceal its [fraud]" without defendant's "acquiescence" and lending of money).  To the contrary, the TAC alleges that the Bassetts had in fact obtained loans from at least two other financial institutions, Ameriquest and Quicken, after NBM had extended loans to the Bassetts.  (*See* Doc. 30 at 140.)

Plaintiffs have not plead with particularity that NBM (a) had actual knowledge of the Bassetts' alleged fraudulent activity, and (b) substantially assisted in that activity.  The TAC's claim of aiding and abetting fraud should therefore be dismissed.

## IV.    Aiding and Abetting Money Laundering Claim

Plaintiffs allege that NBM is liable for aiding and abetting the Bassetts' money laundering when they conducted financial transactions with NBM using proceeds of specified unlawful activity.  (Doc. 30 at 164.)  Under 18 U.S.C. § 1956, a criminal statute, the prosecution may prove that a defendant aided and abetted money laundering by showing that "the defendant associated himself with . . . unlawful financial manipulations, that he participated in them as something he wished to bring about, and that he sought, by his actions, to make the effort succeed."  *United States v. Willey*, 57 F.3d 1374, 1383 (5th Cir. 1995) (internal quotation marks omitted).  Plaintiffs allege that the Bassetts used NBM accounts and received financing from

NBM; they do not allege that NBM actually knew of the Bassetts' alleged unlawful financial manipulations and actively worked to bring about such manipulations.

More fundamentally, however, a criminal statute "may not serve as the basis for a civil cause of action unless the statute includes an express or implied private right of action." *Lumumba v. Mack*, No. 1:13-CV-158-jgm-jmc, 2013 WL 5915195, at *5 (D. Vt. Nov. 5, 2013); *see Hill v. Didio*, 191 F. App'x 13, 14 (2d Cir. 2006) ("A private individual may bring suit under a federal statute only when Congress specifically intended to create a private right of action."); *Didio*, 191 F. App'x at 14–15 ("[W]e have long recognized that crimes are prosecuted by the government, not by private parties."); *Seabury v. City of New York*, No. 06-CV-1477 (NGG), 2006 WL 1367396, at *6 n.7 (E.D.N.Y. May 18, 2006) ("[M]ost sections of the Criminal Code . . . may only be prosecuted by the government, and provide[] no general private cause of action for damages in civil suits."). Section 1956 does not explicitly create a private right of action, nor does the statute imply that Congress intended to create a private right of action. *See Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 668 (S.D.N.Y. 2000) ("18 U.S.C. § 1956 does not give rise to a private right of action."). I therefore recommend that the TAC's claim of aiding and abetting money laundering be dismissed.[5]

## V.   Aiding and Abetting Intentional Infliction of Emotional Distress Claim

Plaintiffs allege that NBM is liable for aiding and abetting the Bassetts' intentional infliction of emotional distress (IIED). (Doc. 30 at 168.) To establish an IIED claim under Vermont law, a plaintiff must show: "(1) conduct that is extreme and outrageous, (2) conduct

---

[5] Similarly, to the extent that Plaintiffs allege that NBM is liable for wire fraud and mail fraud (Doc. 30 at 129, 160–63), these statutes do not provide a private right of action. *See Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019) (no private right of action under the mail fraud statute, 18 U.S.C. § 1341); *In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 132, 140–41 (D. Conn. 2014) (no private right of action under the wire fraud statute, 18 U.S.C. § 1343).

that is intentional or reckless, and (3) conduct that causes severe emotional distress." *Beam v. Bellows Falls Vermont Vill. Corp.*, Case No. 2:20-cv-46, 2021 WL 1118061, at *2–3 (D. Vt. Mar. 24, 2021) (quoting *Thayer v. Herdt*, 155 Vt. 448, 455, 586 A.2d 1122, 1126 (1990)). "An IIED claim can be sustained only where the plaintiff demonstrates outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Id.* at *2 (quoting *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 10, 184 Vt. 1, 955 A.2d 1082). To satisfy the IIED standard, Plaintiffs bear "a heavy burden that requires . . . show[ing] that the [defendant's] conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Cate v. City of Burlington*, 2013 VT 64, ¶ 28, 194 Vt. 265, 277, 79 A.3d 854, 863 (internal quotation marks omitted). The plaintiff must demonstrate "legal harm resulting from inflicted distress so severe that no reasonable person could be expected to endure it." *Baldwin v. Upper Valley Servs., Inc.*, 162 Vt. 51, 57, 644 A.2d 316, 319 (1994).

Plaintiffs have not alleged that NBM had actual knowledge of the Bassetts' alleged fraud or substantially assisted in the fraudulent conduct. These pleading deficiencies fatally undermine Plaintiffs' claim that NBM aided and abetted the Bassetts' allegedly fraudulent conduct. Without knowledge of the underlying alleged Ponzi scheme, NBM could not have engaged in conduct to assist in bringing the scheme to fruition. Moreover, the TAC does not actually allege an IIED claim against the Bassetts themselves. The TAC alleges that the Bassetts engaged in their Ponzi scheme with "ill will, malice[,] and a deliberate choice to defraud"; that the Bassetts were "extremely studied" in their "manipulative abilities"; and that the Bassetts acted with

"pre[]meditated intent to defraud in a very specific and pre[]planned way." (Doc. 30 at 54, ¶¶ 122–23.) It does not allege that the Bassetts intended to cause emotional distress to Plaintiffs or recklessly disregarded a risk that they would cause extreme emotional distress to Plaintiffs. Rather, the TAC suggests that Bassett engaged in the alleged Ponzi scheme initially to make money for himself and later to make money to pay back the investments of Marshall and Bassett's other clients.

In any event, the alleged conduct at issue in this case does not rise to the level of outrageousness required to support an IIED claim. *See, e.g.*, *Jaksich v. Thomson McKinnon Sec., Inc.*, 582 F. Supp. 485, 503 (S.D.N.Y. 1984) (holding that "damages for emotional distress do not lie in an action alleging brokerage mismanagement of a plaintiff's account in violation of [securities laws] and common law"). Further, the IIED claim fails because Plaintiffs' damages are primarily economic in nature, i.e., the loss of approximately $200,000, and do not include any bodily injury. Generally, recovery of emotional distress damages is not allowed "in the absence of either physical impact or substantial bodily injury or sickness." *Kibbie v. Corum Mabie Cook Prodan Angell & Secrest, PLC*, Case No. 5:16-CV-191, 2018 WL 4258114, at *6 (D. Vt. Sept. 6, 2018) (internal quotation marks omitted).

As the TAC fails to state a plausible claim for aiding and abetting IIED under Vermont law, this claim should be dismissed.

## VI.    Aiding and Abetting Breach of Fiduciary Duty and Breach of the Covenant of Good Faith and Fair Dealing

The TAC's third cause of action combines two claims: aiding and abetting breach of fiduciary duty and aiding and abetting breach of the covenant of good faith and fair dealing. (Doc. 30 at 174.) Each of these claims should be dismissed for the reasons explained below.

A.    **Aiding and Abetting Breach of Fiduciary Duty**

A claim for aiding and abetting breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the aider and abettor knowingly induced or participated in the breach, and (3) that the injured party suffered damage as a result of the breach. *RMP Capital Corp. v. Bam Brokerage, Inc.*, 21 F. Supp. 3d 173, 184 (E.D.N.Y. 2014); *see Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1074 (2d Cir. 1977) ("[O]ne who knowingly participates with a fiduciary in a breach of trust is liable to the beneficiary for any damage caused thereby.").  In support of the aiding and abetting breach of fiduciary duty claim, the TAC alleges, in part:

> Mr. Bassett broke th[e] meritorious obligations of . . . a relationship of trust[] through prevarications regarding material facts and other behavior outlined in [the TAC's] allegations, where abuse of his professional standing, as CPA, can be traced to starting long before our relationship ever happened, to which Mr. Bassett received money under false and fraudulent pretense, repeatedly and utilizing specific and repeated felonious acts, particularly false earnings reported through IRS 1099[-]INT.

(Doc. 30 at 177, ¶ 12.)  These allegations and the other allegations in the TAC do not demonstrate that Bassett owed Marshall a fiduciary duty extending beyond their agreement. Without an adequate allegation that Bassett was Marshall's fiduciary, there can be no claim against NBM for aiding and abetting the breach of fiduciary duty.  *See Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 613 (S.D.N.Y. 2011) ("Under either New York or Delaware law, a claim for aiding and abetting breach of fiduciary duty is dependent upon the underlying breach of fiduciary duty."); *Kolbeck*, 939 F. Supp. at 245 ("To analyze a claim of secondary liability, the court first must determine the contours of the primary violation on which the secondary liability is alleged to be based."), *aff'd*, 152 F.3d 918 (2d Cir. 1998).

More fundamentally, even assuming that Bassett breached his fiduciary obligations to Marshall, the TAC does not allege that NBM knowingly induced or participated in the breach of Bassetts' fiduciary duties. The TAC does not allege that NBM was actually aware of Bassett's connection to Marshall during the relevant period. *See In re Centennial Textiles*, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) ("Liability [for aiding and abetting a breach of fiduciary duty] cannot be imposed absent actual knowledge of the tortious conduct of the primary violator. . . . [T]he case may not rest on a bare inference that the defendant must have known the facts; [t]he plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators." (third alteration in original) (internal quotation marks omitted)); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir. 1986) ("A plaintiff's case against an aider, abett[o]r, or conspirator may not rest on a bare inference that the defendant 'must have had' knowledge of the facts[;] [t]he plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators."). Although Plaintiffs fault NBM for essentially enabling the Bassetts' alleged fraud scheme through the provision of banking services, the allegations do not support the plausible inference that NBM knowingly participated with Bassett in the breach of any fiduciary duty to Plaintiffs.

Therefore, Plaintiffs have not pled an actionable claim against NBM for aiding and abetting a breach of fiduciary duty.

### B.   Aiding and Abetting Breach of Covenant of Good Faith and Fair Dealing

Plaintiffs also have not pled an actionable claim against NBM for aiding and abetting a breach of the covenant of good faith and fair dealing. "The implied covenant of good faith and fair dealing is implied by law in all contracts, to protect against conduct which violates

community standards of decency, fairness[,] or reasonableness." *Citibank N.A. v. City of Burlington*, 971 F. Supp. 2d 414, 431 (D. Vt. 2013) (internal quotation marks omitted); *see Bergman*, 847 F. Supp. 2d at 674 ("A covenant of good faith and fair dealing is implied in every Vermont contract . . . ."). A claim of breach of the covenant of good faith and fair dealing sounds in contract, not tort. There can be no such claim where there is no contractual relationship between the parties. *Citibank*, 971 F. Supp. 2d at 431; *see Monahan v. GMAC Mort. Corp.*, 2005 VT 110, ¶ 54 n.5, 179 Vt. 167, 893 A.2d 298, 316 n.5 (noting that "[a] cause of action for breach of the covenant of good faith can arise only upon a showing that there is an underlying contractual relationship between the parties").

In contrast, an aiding and abetting claim sounds in tort: the commission of an underlying tort is the foundational element of the claim. *See, e.g.*, *Montgomery*, 2006 VT at ¶ 20 (noting that claim of "aiding and abetting another in the commission of a tort" first requires a showing of "the existence of a primary violation," i.e., a tort). Aiding and abetting a breach of contract is not a cognizable claim for relief. *See Amtrust N. Am., Inc. v. Safebuilt Ins. Servs., Inc.*, No. 14 Civ. 09494(CM), 2015 WL 7769688, at *9 (S.D.N.Y. Dec. 1, 2015) ("New York law . . . affords no cause of action for aiding and abetting breach of contract—including aiding and abetting breach of the implied covenant of good faith and fair dealing."); *cf. Planete Bleue Television, Inc. v. A&E Television Networks, LLC*, No. 16 Civ. 9317 (PGG), 2018 WL 10579873, at *17 (S.D.N.Y. Sept. 19, 2018) ("[N]o cause of action exists for aiding and abetting a breach of contract." (internal quotation marks omitted)).

The TAC's claims for aiding and abetting breach of fiduciary duty and aiding and abetting breach of the covenant of good faith and fair dealing should therefore be dismissed.

## VII.    Potential Unjust-Enrichment Claims

Construed liberally, the TAC may be asserting a claim of unjust enrichment against NBM.  (*See, e.g.*, Doc. 30 at 89, ¶ 195 (alleging that NBM "engag[ed] in deliberately chosen disregard for the sake of their own unlawful, unethical[,] [and] unjust enrichment").)  "Under the doctrine of unjust enrichment, a party who receives a benefit must return the [benefit] if retention would be inequitable."  *Kellogg v. Shushereba*, 2013 VT 76, ¶ 22, 194 Vt. 446, 458, 82 A.3d 1121, 1130 (alteration in original) (internal quotation marks omitted).  The doctrine applies "if, in light of the totality of the circumstances, equity and good conscience demand that the benefitted party return that which was given."  *Id.* (internal quotation marks omitted); *see Brookside Mem'ls, Inc. v. Barre City*, 167 Vt. 558, 559, 702 A.2d 47, 49 (1997) ("Under a quasi-contract theory of unjust enrichment, the law implies a promise to pay when a party receives a benefit and retention of the benefit would be inequitable."); *Goldberg*, 2018 WL 8370060, at *17.

The TAC does not allege that NBM received a benefit from Plaintiffs that it must now return as an equitable matter.  According to the allegations in the TAC, NBM generally provided ordinary financial services to the Bassetts, including providing loans and banking services.  Plaintiffs allege that NBM was "enriched" because it extended loans and other financial services to the Bassetts.  However, NBM's routine business with the Bassetts by itself cannot form the basis for an unjust-enrichment claim.

Therefore, to the extent that Plaintiffs are asserting an unjust-enrichment claim against NBM, the claim should be dismissed.

## VIII.    Potential Claims Under the Bank Secrecy Act and the Securities Exchange Act

The TAC may also be raising potential claims against NBM under the Bank Secrecy Act

(BSA), 31 U.S.C. § 5311 *et seq.*, and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.

§ 78j(b) (1988), SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1989).  (*See, e.g.*, Doc. 30 at 82, ¶ 183

(alleging that the Bassetts' criminal transactions "should have been reported to [the] proper

authorities, as per the Bank Secrecy Act [and] other regulations"); *id.* at 87, ¶ 190 ("What the

Bassett[]s have done to us . . . [and] what we have suffered does meet all the elements of Section

10(b) [of the Securities Exchange Act]."); *id.* at 136, ¶ 21 (referencing the BSA "and other

similar regulations" that "speak to reporting requirements by regulation, Know Your Customer

Laws").)

### A.    Bank Secrecy Act

Two principal purposes of the BSA are: (1) to "require certain reports or records that are

highly useful in . . . criminal, tax, or regulatory investigations, risk assessments, or proceedings;

or . . . intelligence or counterintelligence activities, including analysis, to protect against

terrorism," 31 U.S.C.A. § 5311(1); and (2) to "protect the financial system of the United States

from criminal abuse" and to "safeguard the national security of the United States," *id.* § 5311(4).

A defendant's liability for failure to comply with the BSA is "to the government rather than [to]

some remote victim."  *Marlin v. Moody Nat'l Bank, N.A.*, Civil Action No. H–04–4443, 2006

WL 2382325, at *7 (S.D. Tex. Aug. 16, 2006), *aff'd*, 248 F. App'x 534 (5th Cir. 2007); *see*

*Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, Case No. 19-cv-02778-TSH, 2019 WL

3503109, at *7 (N.D. Cal. Aug. 1, 2019) (holding that "a defendant's liability for failure to

comply [with the BSA] is to the United States government").  "[C]ourts are unanimous in

holding that there is no private right of action under the BSA . . . ." *Venture Gen. Agency*, 2019

WL 3503109, at \*7; *see James v. Heritage Valley Fed. Credit Union*, 197 F. App'x 102, 106 (3d Cir. 2006) ("[T]he [BSA] does not authorize a private cause of action against a financial institution or its employees."); *Marlin*, 2006 WL 2382325, at \*7 ("The [bank's] obligation is not to roam through its customers looking for crooks and terrorists.  By th[e] [BSA], banks do not become guarantors of the integrity of the deals of their customers."); *Agape I*, 681 F. Supp. 2d at 360 (explaining that "the [BSA] does not create a private right of action," and finding "no sound reason to recognize a duty of care that is predicated upon the [Act's] monitoring requirements"); *Venture Gen. Agency*, 2019 WL 3503109, at \*7 (noting that, "as there is no private right of action, there can be no duty of care arising out of the BSA's monitoring requirements").

To the extent that the TAC asserts a BSA claim against NBM, the claim should be dismissed because the statute does not provide a private right of action.

### B.    Section 10(b) of the Securities Exchange Act of 1934

The Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  In order to succeed on a claim under the Act, "[the] plaintiff must establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks omitted).  As discussed above, the TAC fails to plead this level of scienter with respect to NBM, and especially fails to so plead "with particularity," as required for a securities fraud claim.  *Id.*

at 196.  The TAC also fails to plead with particularity the requisite intent by NBM.  *See Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 485 (2d Cir. 1979) (noting that "if a bank lends money to a customer who then uses it to perpetrate a fraudulent scheme, there is probably neither intent nor causation on which to find the bank liable for a 10b-5 violation").  Additionally, § 10(b) of the Securities Exchange Act does not create or support a private cause of action for aiding and abetting securities fraud.  *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994).

In support of their claim under the Securities Exchange Act, Plaintiffs cite *In The Matter of Deutsche Bank AG*, a July 2020 Consent Order issued by the New York State Department of Financial Services.  *See* New York State Dep't of Fin. Servs., *Consent Order under New York Banking Law §§ 39 and 44* (July 6, 2020), https://www.dfs.ny.gov/system/files/documents/ 2020/07/ea20200706_deutsche_bank_consent_order.pdf (last visited 8/9/21).  (*See* Doc. 50 at 9–10.)  In that case, Deutsche Bank and its affiliates agreed to pay $150 million in penalties for significant compliance failures and violation of New York banking laws arising from the bank's relationship with Jeffrey Epstein.  *Consent Order*, at 32–33.  The *Deutsche Bank* case is distinguishable from this case.  First, this case is brought by private individuals, whereas the Deutsche Bank Consent Order was issued by New York's Department of Financial Services and based principally on the Department's "determina[tion] that Deutsche Bank failed in various respects to meet [its] obligations" under "New York State law requir[ing] financial institutions to devise and implement systems reasonably designed to identify and report suspicious activity and block transactions prohibited by law," *id.* at 2–3.  Second, the facts in the Deutsche Bank Consent Order substantially differ from the allegations in Plaintiffs' TAC.  Specifically, Epstein's history of sexual misconduct and trafficking of young women preceded his relationship

with Deutsche Bank.  A Deutsche Bank manager who had worked with Epstein at a prior bank was not only aware of Epstein's criminal activities, but also shared that information with Deutsche Bank executives.  *Id.* at 4, 6–7.  Moreover, despite having classified Epstein as "high-risk," *id.* at 8, the bank disregarded not only Epstein's criminal history, but also 120 wire transfers totaling $2.65 million, some to Epstein's alleged coconspirators and some to women for the stated purpose of covering "hotel expenses, tuition, and rent," *id.* at 10; multiple settlement payments totaling over $7 million to law firms, and dozens of other payments totaling over $6 million to law firms, *id.*; and suspiciously large cash withdrawals, including a cash withdrawal of $100,000 for "tipping and household expenses," *id.* at 18.  By contrast, the TAC does not allege facts demonstrating NBM's actual knowledge of the Bassetts' alleged criminal conduct, or NBM's substantial assistance in that conduct.

Plaintiffs' claims under the Securities Exchange Act should be dismissed for failure to state a claim.

## IX.     Potential Common Law Negligence Claims

Read liberally, the TAC could be construed to allege that NBM is liable for negligent failure to detect and attempt to stop (namely by reporting to the authorities) the Bassetts' alleged criminal use of their bank accounts with NBM.  (*See* Doc. 30 at 88, ¶ 192 (alleging that "without NBM's intentionally negligent averted gaze re[garding] the Bassett[]s['] bank account, with which many . . . red flags . . . [evidencing] obvious crime [and] money laundering . . . should have been reported [and] law enforcement contacted," the Ponzi scheme "would have collapsed, folded, ended . . . before we ever heard of Larry Bassett"); *id.* at 106, ¶ 236 (alleging that "had NBM not acted in what was a deliberate [and] harrowingly negligent choice to ignore the Bassett[]s['] red flags [and] criminal activity, . . . [Plaintiffs] would never have been put through

this whole tragic [and] traumatic, incredibly exhausting, financially stripping, emotionally

taxing[,] and life eviscerating experience").)

      To state a negligence claim under Vermont law, a plaintiff must allege that: (1) the

defendant owed "a legal duty"; (2) the defendant breached that duty; (3) the breach was the

"proximate cause" of the plaintiff's injury; and (4) the plaintiff suffered "actual loss or damage."

*Spooner v. Todd Transp. Co.*, Case No. 2:15-cv-00191, 2018 WL 1281788, at *5 (D. Vt. Mar. 9,

2018) (quoting *Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63, 67, 968 A.2d 336, 340).  While

NBM may have owed a duty to Marshall by virtue of Marshall's own personal account with

NBM (*see* Doc. 30 at 138, ¶ 29 (alleging that "Bruce Marshall is also a customer of NBM")),

that duty could not include an obligation to shield Marshall from financial loss due to another

customer's use of his own accounts with NBM to carry out an alleged fraud scheme, particularly

where it is not shown that the bank had actual knowledge of the fraudulent conduct.  *See Cohen

v. Standard Bank Inv. Corp. (Jersey)*, No. 97 Civ 3802(SAS), 1998 WL 782024, at *7 (S.D.N.Y.

Nov. 6, 1998) (holding that bank owed no duty of care to investor in allegedly fraudulent scheme

perpetrated by bank borrower); *Century Bus. Credit Corp. v. North Fork Bank*, 246 A.D.2d 395,

396, 668 N.Y.S.2d 18, 19 (N.Y. App. Div. 1st Dep't 1998) (holding that bank is not liable for

negligence to customer's creditors, and stating that requiring a bank to monitor its customer's

financial activities would "unreasonably expand banks' orbit of duty"); *Lerner*, 459 F.3d at 287

("As a general matter, a depository bank has no duty to monitor fiduciary accounts maintained at

its branches in order to safeguard funds in those accounts from fiduciary misappropriation."

(internal quotation marks omitted)); *Renner v. Chase Manhattan Bank*, No. 98 Civ. 926(CSH),

1999 WL 47239, at *14 (S.D.N.Y. Feb. 3, 1999) ("*Renner I*") ("a bank cannot be held

accountable for the ways in which its customers manage their accounts"), *abrogated on other*

*grounds by MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 277 (2d Cir. 2011).

The TAC's potential negligence claim is premised on virtually identical facts, and similar

legal theories, as the claims addressed in the cases cited above.  Given that a key element of a

negligence claim is that the defendant owed a duty to the plaintiff, and having already found that

NBM did not have a duty to Plaintiffs to detect and thwart the Bassetts' fraud, any potential

negligence claim must fail.  Because "the scope of the legal duty of ordinary care[] is determined

by the foreseeability of the consequences of an individual's acts or omissions," *Edson v. Barre*

*Supervisory Union No. 61*, 2007 VT 62, ¶ 10, 182 Vt. 157, 161, 933 A.2d 200, 204, Plaintiffs'

allegations do not support a claim that NBM should have foreseen that the Bassetts' ordinary use

of its banking services would cause financial harm to Marshall.  Although Plaintiffs allege that

Bassett's NBM bank account showed $60,000–$70,000 in monthly deposits and withdrawals for

approximately two years, and that Bassett opened and quickly paid off mortgages/home equity

loans totaling $1,743,450 over a 17-year period, this type of banking activity is not so unusual

that it would reasonably lead NBM to foresee Bassett's alleged orchestration of a Ponzi scheme

to Plaintiffs' financial detriment.  *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 431 F.

App'x 17, 20 (2d Cir. 2011) ("Appellant has failed to explain how isolated transfers of money,

even of large sums, necessarily constitutes 'clear evidence' of misappropriation. . . .  [I]t is not

unusual for money to be transferred into and out of investment accounts; investment advisors

could not buy and sell securities on behalf of their clients if they did not transfer money to and

from various accounts.").

Additionally, the TAC does not adequately plead that NBM's acts or omissions were the

"proximate cause" of the harm to Plaintiffs.  "The law of proximate cause calls for a causal

connection between the act for which the defendant is claimed to be responsible and which is alleged to be negligent and the resulting flow of injurious consequences." *Rivers v. State*, 133 Vt. 11, 14 (1974). "[T]he hallmark feature of proximate causation . . . is reasonable foreseeability." *Baker*, 2017 VT 91, ¶ 10. Where the criminal act of a third person (Bassett) intervenes between the alleged negligent act of the defendant (NBM) and the harm to the plaintiff (Marshall), the defendant is not responsible for the harm:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

Restatement (Second) of Torts § 448 (1965). Even assuming that NBM was negligent in failing to detect and report the Bassetts' fraudulent activity, the TAC does not plausibly allege that NBM should have foreseen that the Bassetts would use their bank accounts and other financial dealings with NBM to engage in a criminal scheme that would cause financial harm to Marshall. *See Sosa v. Coleman*, 646 F.2d 991, 993–94 (5th Cir. 1981) ("Where the intervening act is a criminal act of a third party, and because a person usually has no reason to foresee the criminal acts of another, the criminal act generally breaks the chain of causation and thus the original negligence of the defendant cannot be the proximate cause of the injury resulting from the intervening criminal act.").

Accordingly, to the extent that the TAC alleges a negligence claim, the claim should be dismissed.

## Conclusion

For the reasons above, I recommend that the Court GRANT NBM's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. 36) in its entirety and DISMISS the Third Amended Complaint with prejudice.

Dated at Burlington, in the District of Vermont, this 3rd day of December 2021.

_/s/ Kevin J. Doyle_____
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections that shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (quoting *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)).